## John Ayers v. The State.

1. JURISDICTION OF THE COURT OF APPEALS.— Where an appeal has been improperly returned to a term of this court to which it was not primarily returnable, this court acquires no jurisdiction, and a judgment rendered thereon at such term is absolutely void; and a motion for rehearing of such a judgment will be entertained whether or not it was made at that term, and whether or not it was made in the mode provided by the rule.

2. SAME.— If, however, the appeal was prosecuted to the term of this court then in session, in conformity with the rule, this court acquired jurisdiction, and any judgment rendered, whether correct or not, was a valid judgment; and to authorize this court to entertain a motion for rehearing at a subsequent term of the court, the rule governing such practice must be rigidly pursued.

3. PRACTICE IN THIS COURT.— The rule governing motions for rehearing filed after the adjournment of this court for a term is as follows: " When the Supreme Court (Court of Appeals) at any one of the places where it sits for the transaction of business, adjourns for the term within less than fifteen days after the rendition of judgment, the issuance of the mandate shall, unless otherwise ordered, be withheld until the expiration of said period; and if, within that period, an application for rehearing shall be presented to the clerk of the court at that place, having indorsed thereon the order of any member of the court that it be filed, the issuance of the mandate shall further be withheld, to await the action of the court on said application. The clerk, in addition to the steps required of him in other rehearing cases, shall forward the papers and the application to the clerk of the court at the place of its session next succeeding that at which the judgment was rendered.

4. PRACTICE — APPEAL.— The Code of Criminal Procedure provides that an appeal in a felony case may be prosecuted immediately to the term of this court in session at the time the appeal is taken, or to the first term of this court after such appeal, without regard to the law governing appeals in other cases; and requires the clerk upon the application of either party to make out and forward without delay to this court wherever it may be in session, or, if not in session, to the clerk of this court where it will next be in session, a transcript of the case, which transcript shall contain all the proceedings in the case.

5. SAME.— An application for the return of an appeal in a felony case to the term of this court then in session need not be incorporated in the transcript. If made orally in term time the better practice would be to embody in the transcript the application or request of the prosecuting attorney or of the defendant or his counsel, as indicated in *Reynolds* v. *State*, 8 Texas Ct. App. 209. If, however, the application be in writing, a certified copy properly authenticated to this court by the clerk will suffice.

APPEAL from the District Court of Bexar. Tried below before the Hon. G. H. NOONAN.

The indictment in this case charged the appellant with the theft of a horse, the property of William Graham.

His trial resulted in conviction, and the punishment imposed by the verdict was a term of nine years in the penitentiary. An appeal having been taken, it was, upon the application of the county attorney, returned to the Galveston term of this court, then in session, where the defendant moved to strike the case from the docket, and have it transferred to the Austin branch. That motion was overruled, and the case being considered on its merits, the judgment was affirmed. This proceeding is a motion praying the court to reconsider its action in overruling the original motion at its Galveston term.

William Graham, the prosecuting witness, testifying for the State, detailed the circumstances of the theft of his horse, which occurred in the city of San Antonio, on the night of September 7, 1881. He and Jackson Merritt had been out driving cattle all day, and came in town late that evening, very hungry. They rode to the Military plaza and hitched their horses behind a wagon which stood some ten steps from a table kept by a Mexican, and from there went to the table to get supper. In a short time some one exclaimed, "Look out! there is a man stealing a horse." The witness looked up and saw a man at his horse, and started to run towards him, but before he could reach the wagon the man jumped on the horse and rode off in a run. When he reached the wagon he found that the rope with which he had tied his horse had been cut. The thief was a white man. The witness recovered his horse in a few days. From information received the day after the theft the witness knew where his horse had been taken to, and, in company with deputy sheriffs Ed. Stevens and Joe Sheeley, he went to Bandera county, and there, at the house of the defendant on Pipe creek, recovered his horse, saddle and bridle. The witness, Stevens and Sheeley arrived at the house of the defendant late at night and surrounded it, and at dawn next morning closed in on the house and arrested the defendant and a man named Crowder.

When the arrest was made the defendant was sleeping with his wife, and Crowder was sleeping in another room. Upon waking, the defendant started for his gun, but stopped when the parties threw their six shooters down on him. Merritt, who had been driving cattle with the witness on the day of the theft, hitched his horse by the bridle to the same wagon and near the witness's horse, when they went to the Mexican's table to get supper. When the thief jumped on the witness's horse and started off, Merritt, who had finished his supper and was standing near the table, ran to his horse, mounted and started in pursuit. The thief had some ten or twenty steps the start of Merritt. Before starting to Bandera county the witness made an affidavit against the defendant and a man named Crowder, charging them with the theft of his horse, and procured a warrant for their arrest, which the party took with them. The horse was taken without the witness's authority or consent.

On cross-examination the witness stated that the lights on the plaza had been burning but a short time when the horse was taken. From the view of the man which he had at the time the witness could not identify him, nor had he said that it was the defendant who rode his horse off. It was a man similar in build to the defendant, but the witness was not near enough to recognize him positively as the defendant on trial. The witness recovered the same horse, bridle and saddle which were stolen from him, at the defendant's place in Bandera county. The horse was taken back of a small enclosure, a few hundred yards from the house, and the saddle and bridle were found under some brush near the fence of the enclosure. Up to the time of theft of the horse the witness had never seen the defendant, and could not identify him as the thief.

Capt. Ed. A. Stevens testified for the State that he was and had been for several years a deputy sheriff of Bexar

county.   On the night of the 6th or 7th of September,
1881, it was reported to him that William Graham's horse
had been stolen from him while he was taking supper at
one of the Mexican tables on the Military plaza.   On the
next evening the witness received some information about
the horse, and by whom it was taken, and communicated
it to Mr. Graham.   Upon this information Graham went
before a justice of the peace and made an affidavit against
the defendant and a man named Crowder, charging them
with the theft.   Upon this affidavit the justice issued a
warrant for the arrest of both parties, and placed it in
the hands of the witness for execution.   On the next
day, as soon as he could get off, he started, taking with
him deputy sheriff Joe Sheeley and William Graham.
The party reached the defendant's house after night, and
watched it until about dawn, when they entered the house
and arrested both Crowder and the defendant.   Joe
Sheeley arrested the defendant and the witness arrested
Crowder, and the party brought them both to San Antonio.
The defendant when arrested was in one room with his
wife, and Crowder was in another.   After the arrest, the
party searched for Graham's horse, finding him after
some time staked back of a small pasture some two hun-
dred yards from the house.   The saddle and bridle were
lying close to the fence, with brush thrown over them.
Graham identified the horse, saddle and bridle as his, and
as the same which had been taken from the wagon on
the plaza.   The arrest was made on the morning of the
9th or 10th of August.   When the party left San Antonio
with the warrant for the arrest of the defendant and
Crowder, they went direct to the defendant's house on
Pipe creek in Bandera county, which is distant from San
Antonio some forty or forty-five miles.

Cross-examined, the witness stated that the informa-
tion given to Graham was received by telegram from
Sheriff Niggli of Medina county.   The witness did not, of

his own knowledge, know who stole Graham's horse; he did not of his own knowledge know that Graham had a horse stolen at all. The defendant did not have the horse when he was arrested. The animal was staked out about two hundred yards from the house. Sheeley and Graham arrested the defendant, and the witness arrested Crowder. After Crowder was brought to San Antonio he was sent to Austin under *capias* from Travis county.

The testimony of Jackson Merritt, the next witness for the State, up to the time that the man mounted the Graham horse, was a verbatim repetition of the testimony of Graham. He testified further that as soon as he could reach his horse he mounted and started in pursuit, the man on Graham's horse having some fifteen or twenty steps the start. As the man made a short turn around the old court house, to go west across the San Pedro, the horse stumbled and came near falling. Before he could recover the witness rode up to his side, and was just in the act of reaching out to take hold of the bridle-rein when his horse bore off to the right, and an express wagon which was coming towards him passed between him and the man. Another express wagon behind the first made a quick turn across the street on the side where the witness was riding, and he had to check up to get by it, and by this time the man was sixty or seventy yards ahead. The witness continued the pursuit as fast as he could ride, but did not again overtake the man.

The witness found deputy sheriff Joe Sheeley in the lower part of town, and told him of the theft, giving him a description of the man, whose name the witness did not know. Sheeley started in pursuit but failed to overhaul him. When the horse stumbled in making the short turn and the witness rode up alongside, he had a fair, full view of the man on Graham's horse. The witness had never seen the man before that he knew of, but he was now in the court house, and is the defendant on

trial in this case. The witness testified that he could not be mistaken; he was absolutely certain that the defendant on trial and the man who rode off Graham's horse, at the time alleged in the indictment, were one and the same.

. The cross-examination was confined to the testimony of the witness identifying the defendant as the man who rode off Graham's horse. The witness reiterated and emphasized his testimony in chief, and declared that when he rode up on him when the horse stumbled he could have touched him with his hand. At that time he got a good, square, full view of his face in the bright lamp and gaslight, and he could not possibly be mistaken. The defendant was, the witness stated, unquestionably the man who took Graham's horse from the wagon and rode him off.

The defendant introduced no testimony.

*J. S. Carr*, for the appellant.

*H. Chilton*, Assistant Attorney General, for the State.

HURT, J. This case was before us at Galveston, and at that branch of this court the appellant moved to strike the case from the docket, and have the same sent to this the Austin branch. This motion was based upon the grounds that the case belonged to this branch, and not to Galveston, and that the application of the district attorney for the cause to be sent to Galveston was not inserted in the transcript. The motion of appellant to strike from the docket and have the cause sent to this branch was overruled, and the case being considered upon the merits, the judgment was affirmed.

The appellant now moves this court to reconsider its action in overruling his motion at Galveston. If the cause was not properly sent to Galveston, this court had no jurisdiction of the same and the judgment was and is.

void; and whether this motion for rehearing was made at Galveston, or in the mode pointed out in the rule, makes not the slightest difference, for this court will entertain the motion. If, however, the court had jurisdiction at Galveston, the judgment affirming the judgment below, whether correct or not, was a legal and valid judgment, and to authorize this court at this branch to entertain a motion for rehearing, the rule must be pursued.

The rule is as follows: "Where the Supreme Court at any one of the places where it sits for the transaction of business adjourns for the term within less than 15 days after the rendition of judgment, the issuance of the mandate shall, unless otherwise ordered, be withheld until the expiration of said period; and if within that period an application for rehearing shall be presented to the clerk of the court at that place, having indorsed thereon the order of any member of the court that it be filed, the issuance of the mandate shall be further withheld to await the action of the court on said application. The clerk, in addition to the steps required of him in other rehearing cases, shall forward the papers and the application to the clerk of the court at the place of its session next succeeding that at which the judgment was rendered."

The course pointed out by this rule was not taken by the appellant; hence this court cannot entertain the motion unless there was want of jurisdiction in this court at Galveston. Had the court jurisdiction of the cause at Galveston? The appellant urges against the jurisdiction the fact that the application of the district attorney to have the case sent to Galveston was not included in and made a part of the transcript, but was sent with the transcript detached therefrom. The question presented is, does the law require this application to be inserted in the transcript?

Art. 843 of the Code of Criminal Procedure provides

that, "An appeal in a felony case may be prosecuted immediately to the term of the Court of Appeals pending at the time the appeal is taken, or to the first term of such court after such appeal, without regard to the law governing appeals in other cases; and it shall be duty of the clerk, upon application of either the State or the defendant, to make out and forward, without delay, to the Court of Appeals wherever it may be in session, or, if not in session, to the clerk of said court where it will next be in session, a transcript of the case." The transcript must contain all the proceedings had in the case. Art. 860, Code Crim. Proc.

This application may be made after the proceedings are all had in a case. It certainly would not constitute a part of the proceedings if made after the court had adjourned. We are therefore of the opinion that the application need not be inserted in the transcript. If made orally in term time the better practice would be that indicated in *Reynolds* v. *State*, 8 Texas Ct. App. 209; but, if written, a certified copy properly authenticated by the clerk to this court will suffice.

We are of the opinion that this court had jurisdiction of the case at Galveston, and as the rule for rehearing was not complied with, this motion must be dismissed.

*Motion dismissed.*